# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50359 | **DATE** | 7/27 /2005 |
| **CASE TITLE** | Funk vs. Barnhart | | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the record and pleadings is denied.

■ [ For further detail see attached order.]

Notices mailed by judge's staff.

F I L E D

JUL 2 7 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | Courtroom Deputy Initials: | AM |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT **F I L E D**
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION **JUL 2 6 2005**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| RICHARD J. FUNK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50359 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Richard J. Funk ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. §

416, 423, and his application for Supplemental Security Income ("SSI"), pursuant to Title XVI

of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate

Judge pursuant to consents filed by both parties on August 30, 2004. *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

### I. BACKGROUND

Plaintiff filed for DIB and SSI on December 19, 2001. (Tr. 62-64). The applications

were first denied on March 11, 2002. (Tr. 28-32). Plaintiff filed a request for reconsideration on

March 20, 2002. (Tr. 33). Plaintiff was again denied on April 26, 2002, after reconsideration.

1

(Tr. 34-37). Plaintiff filed a request for hearing before an Administrative Law Judge (ALJ) on May 21, 2002. (Tr. 38-9). Plaintiff appeared, with counsel, before Judge William A. Wenzel on November 19, 2002. (Tr. 11).

In a decision dated January 27, 2003, the ALJ found that Plaintiff was not entitled to SSI or DIB. (Tr. 11-20). On January 30, 2003, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 10). On August 6, 2004, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7).

Previously, Plaintiff filed an application fo Disability Insurance Benefits on November12, 1999, which was initially denied on February 16, 2000. (Tr. 59-61). This denial was apparently not appealed. (Tr. 14). Plaintiff presently alleges a disability onset date of January 1, 2002, and there is no basis to reopen this previous application. (*Id.*).

## II. FACTS

Plaintiff was born on April 11, 1952, and was fifty years old at the time of his November 19, 2002, hearing before the ALJ. (Tr. 21). Plaintiff has a tenth grade education followed by a GED in approximately 1994. (Tr. 73, 103, 214). At the time of his hearing, Plaintiff indicated that he lived alone,[1] and he had lived at his current residence since November 1, 2001. (Tr. 196A). Plaintiff testified that he has had no other source of income since January, 2002.[2] (Tr. 220).

---

[1]     The record indicates that Plaintiff had custody of and supported his three children, at least through January 3, 2000. (Tr. 91). Plaintiff indicated his youngest child, of age seven, had ADHD and that he was hoping for SSI assistance. (*Id.*).

[2]     Plaintiff indicated he expected to receive court ordered child support each month of the alternating amounts of $360.00 and $288.00 from November, 2001, through January, 2003. (Tr. 196A-97).

Plaintiff worked for Furnace Assembly Eclipse, Inc. as a factory parts assembler from August, 1976, until November, 1988. (Tr. 110). Plaintiff assembled furnaces, blowers and other equipment using a variety of machines and heavy tools. (Tr. 111) Plaintiff worked mostly in a standing or stooped position, frequently lifting or moving parts of fifty pounds or more. (*Id.*). Occasionally lifting objects weighing more than one hundred pounds was required. (*Id.*). He received ten dollars and eighty-nine cents per hour for his services. (*Id.*).

From November, 1988, until June, 1994, Plaintiff worked for Pierce Box and Paper, a paper products distributor, as a warehouse worker. (Tr. 112). He performed a variety of tasks including: custodial work, preparing orders for truck drivers, operating forklifts, and loading and unloading semi trucks. (*Id.*). Plaintiff spent most of his time in a standing, walking, kneeling or crouched position. (*Id.*). This job required him to frequently lift objects weighing fifty pounds or more, and occasionally objects weighing in excess of one hundred pounds. (*Id.*). Plaintiff received seven dollars and twenty-five cents per hour for his services. (*Id.*).

Plaintiff worked for Triangle Metals Inc. from February, 1989, until November, 1990. (Tr. 113). Again, he worked as a factory assembler, utilizing heavy tools and equipment to produce large clothes dryers and other machines. (*Id.*). Plaintiff performed this job in a standing position and frequently was required to lift or carry fifty pound objects and occasionally objects weighing more than one hundred pounds. (*Id.*). He was paid eight dollars and twenty five cents per hour. (*Id.*).

From June, 1994, until July, 1999, Plaintiff worked as a deburring technician at Ingersoll Cutting Tool. (Tr. 82). Plaintiff used air tools to remove metal burs from industrial parts. (Tr. 114). Although he was required to stand, kneel, and crouch, Plaintiff primarily worked from a

3

seated position. (*Id.*). On occasion, he was required to lift objects weighing greater than one hundred pounds, however, he frequently lifted or carried smaller objects that were typically lighter than ten pounds. (*Id.*). Plaintiff earned ten dollars and eighty seven cents per hour at this position. (*Id.*).

From November, 2000, until January, 2001, Plaintiff worked as an assembler at Enklecorp. (Tr. 120). His responsibilities required the use of large tools to manufacture printing presses and similar equipment. (Tr. 115). This job required him to spend most of his time on his feet, either standing or walking six to ten hours a day. (*Id.*). Plaintiff was frequently required to lift objects weighing fifty pounds or more, and occasionally to lift objects weighing over one hundred pounds. (*Id.*). He was compensated fourteen dollars per hour for his services. (*Id.*). Plaintiff was ultimately laid off when the company ran out of work. (Tr. 120).

Plaintiff acquired a position at Pacemaker Bakery from July, 2001, until September, 2001. (Tr. 110). His job duties included transporting dough from a freezer, mixing frosting using a large mixing machine, kneading dough, and monitoring the baking of bread. (Tr. 116). This job required him to stand or walk for up to eight hours per day and to frequently lift objects weighing ten pounds and occasionally objects weighing fifty pounds. (*Id.*). For his services, he received eight dollars per hour. (*Id.*). Plaintiff testified that he was unable to meet co-workers' expectations of moving quickly from the oven area to the freezer area of the bakery. (Tr. 218-19) He stated that he was asked to assist other co-workers in performing heavier work, including lifting and carrying ingredients. (Tr. 119). On several occasions he fell down. (*Id.*). Plaintiff indicated on his work activity report that he stopped working or changed the type of work he was doing for reasons other than his medical condition or the removal of special conditions at work

4

related to his medical condition. (Tr. 119). Plaintiff stated "[I was] released from Pacemaker for a bad attitude because I was not able to work separate ends of building simultaneously . . . could not run fast enough to bake in [the] oven and replace [the] op[posite] ends of building stock in freezer." (*Id.*).

In November, 2001, Plaintiff took a part-time position as a veterinary assistant at Pecatonica Veterinary Clinic. (Tr. 119). His duties consisted primarily of custodial and maintenance work, but on occasion he was required to assist the veterinarian in lifting large dogs onto an operating table. (*Id.*). While there, he was compensated eight dollars per hour for his services. (Tr. 120). In January, 2002, Plaintiff was let go due to his inability to effectively assist in lifting heavier dogs. (*Id.*).

Since January, 2002, Plaintiff testified that he has looked on and off for custodial work because he has performed that type of work before in his life. (Tr. 220). He has been unable to find any custodial work. (*Id.*).

Plaintiff described his typical day beginning with taking his children to school,[3] and then checking local places for possible employment opportunities. (Tr. 89). When he arrives home, he performs housework and sends his resume out to look for jobs. (*Id.*). He also routinely cooks and shops for groceries. (Tr. 91). Plaintiff stated that since March 20, 2002, he has experienced changes in his daily activities including more trouble performing daily tasks such as: showering, household chores, yard work, cooking meals, and taking care of his children. (Tr. 129). Plaintiff

---

[3]    Plaintiff's statements made on or prior to January 3, 2000, show his typical day involved caring for his children. (Tr. 90). However, in his application for Supplemental Security Income Benefits, filed December 19, 2001, he indicated he lived alone. (Tr. 196). The transcript provides no new information as to Plaintiff's typical day.

receives food stamps as assistance. (Tr. 196A). He stated he has emphysema caused by smoking, and in testimony to the ALJ, he stated he quit smoking ten years ago. (Tr. 227).

Plaintiff stated he dislocated and tore ligaments in his left knee when he was fifteen years old and that arthritis has since set in. (Tr. 97). He was first bothered by this injury or condition on January 15, 1989. (Tr. 112). Plaintiff indicated his knee, hip, and ankle began aching with occasional hot shooting shocks on September 24, 1999. (Tr. 88). He believed the pain was due to torn ligaments and arthritis in the joints. (*Id.*).

Plaintiff stated on January 3, 2000, that his left knee started to buckle under strain, that both knees started to bow very badly, and that his left ankle and hip started popping out of place, causing him to limp and walk slow. (Tr. 90). Since March 20, 2002, Plaintiff experienced increased pain in his left knee and shoulders, increased swelling in both knees, and needle pain in his feet, ankles, and hips. (Tr. 129).

On February 1, 2002, at an examination with Dr. Ramchandani, Plaintiff described his pain as sharp to dull aching, constant, worsening in wet and cold weather or during activities like standing for half an hour, lifting sixty pounds, or walking for a mile. (Tr. 171). Plaintiff also claimed to have dull, aching pain in both shoulders for the last six or seven years that would precipitate on any range of motion, or on lifting forty to fifty pounds, and this was associated with recurrent dislocations. (*Id.*).

Plaintiff indicated he took Tylenol arthritis three times a day for his pain. (Tr. 88). He felt some relief fifteen minutes after taking the medication and this relief lasted two and a half to three hours. (*Id.*). Additionally, Plaintiff wore Ace knee braces on both knees to help relieve knee pain. (*Id.*). Hydrocodone 500 mg has helped relieve Plaintiff's pain so he could sleep at

6

night after long hours at work. (Tr. 90). Plaintiff has also felt effective pain relief from Celebrex. (Tr. 170). However, he stated that he no longer could afford his prescription of Celebrex. (Tr. 129). From May 19, 2000, Plaintiff began a three stage Synvisc therapy treatment, and by the second visit on May 26, 2000, claimed that he already noticed improvement as a result of the first injection. (Tr. 170). On June 2, 2000, Plaintiff again indicated that his left knee felt some improvement from the treatment. (*Id.*). At a later visit to the doctor's office, on June 29, 2001, Plaintiff stated previous Synvisc injections had given him no relief. (*Id.*).

Plaintiff testified that although he has constant pain in his knees and shoulder, home exercises suggested by his physical therapist helped to relieve some pain. (Tr. 223). Celebrex prescribed by Dr. Fancaley, his physician, also helped alleviate his joint and muscle pain; however this prescription was not covered by his State of Illinois medical card. (Tr. 226-30). Plaintiff stated that doctors informed him that he would not regain full use of his arms or legs without surgery, and he chose not to have surgery due to financial reasons. (Tr. 225-29). The ALJ questioned Plaintiff's ability to perform a job (excluding those requiring overhead lifting or reaching) requiring some use of his arms and legs if the pain could be controlled by medication such as Celebrex. (Tr. 229). Plaintiff replied "jobs aren't out there," and "[he hasn't] been able to find anything." (*Id.*).

The ALJ asked Vocational Expert ("VE") Christopher J. Yep to describe Plaintiff's past work. (Tr. 190). Mr. Yep, using terms taken from the *Dictionary of Occupation Titles* ("DOT"), testified that Plaintiff had performed several separate types of employment. (Tr. 230). Plaintiff worked in three assembly positions that were all unskilled and ranged in exertional level from medium to heavy. (*Id.*). However, Mr. Yep asserted assembly jobs also exist at light and

7

sedentary levels of exertion in the national economy. (*Id.*). Mr. Yep further testified Plaintiff's

work as a warehouse worker qualified as medium unskilled work. (Tr. 230-31). Furthermore,

Mr. Yep stated Plaintiff's work as a deburring technician was unskilled and performed at a heavy

level of exertion. (Tr. 231). Finally, Mr. Yep classified Plaintiff's bakery job as unskilled, at a

medium level of exertion. (*Id.*). Mr. Yep did not discuss Plaintiff's veterinarian assistant

position because Plaintiff had performed it for little more than one month. (*Id.*).

The ALJ then asked Mr. Yep whether a hypothetical person possessing certain physical

characteristics could perform Plaintiff's previous employment. (Tr. 236-37). Specifically, the

ALJ asked Mr. Yep to assume the following:

> an individual who is currently 50 years old . . . has a GED degree . . . osteoarthritis of the
> knees . . . may . . . at some . . . point . . . requir[e] that he have knee replacement surgery.
> Who has osteoarthritis of the shoulders . . . and [a] rotator cuff tear in his right shoulder.
> And that it was the opinion of one of his treating physicians that . . . surgical repair
> would do nothing for his . . . limited range of motion. And . . . he would be better off to
> engage in . . . therapy to increase his range of motion and functioning of his upper
> extremities, which he did . . . experienc[ing] some improvement in his range of motion
> and use of his upper extremities. He . . . tak[es] Celebrex for relief of pain in both the
> shoulders and knees, and . . . has also had . . . chronic obstructive pulmonary disorders,
> which have been treated with Proventil and Advair . . .[His] past relevant work over the
> last 15 years has consisted of work that you have classified for claimant in this case.
> And this individual has a residual functional capacity to lift up to 20 pounds occasionally
> and 10 pounds frequently, can sit, stand, and walk for up to six hours in an eight-hour
> work day, up to one hour at a time without interruption . . . can only do limited pushing
> and pulling with his upper extremities. Cannot do any overhead reaching on even an
> occasional basis, can only occasionally climb stairs, stoop, crouch, and should not do any
> crawling [nor] climb any ladders [nor] work at heights or . . . around hazardous
> machinery.

(*Id.*). Mr. Yep testified that such a hypothetical person could not perform any of Plaintiff's past

relevant work as Plaintiff performed it, or as such work is generally performed in the national

economy. (Tr. 237).

8

The ALJ then inquired as to other jobs that the above hypothetical person could perform. (Tr. 238). Mr. Yep testified that at the light exertional level, such a person would be able to perform assembly work, work as a sorter, or as a sales clerk. (Tr. 238-39). According to the VE, an individual possessing the residual functional capacity ("RFC") of the hypothetical person is capable of performing a total of 166,299 jobs in the state of Illinois. (Tr. 238-242). Mr. Yep concluded that at the light level, 27,507 assembly positions, 9,782 sorting occupations, and 129,010 sales clerk jobs existed in the state. (*Id.*).

The VE stated that the sales clerk positions and approximately sixty percent of the light level sorting and assembly jobs would require the person to stand and/or walk six of eight hours. (Tr. 242). Upon further questioning, the VE yielded that although some percentage of light level work would be available to a person with the capability of standing and/or walking four of eight hours, a person capable of standing or walking two of eight hours would be limited to sedentary work. (Tr. 243-44). Thus, he indicated that approximately forty percent or 14,915 assembly and sorting positions and all 129,000 sales clerk positions were available at the light level to someone that could only stand and/or walk six of eight hours. However, only twenty percent of the assembly and sorting positions, or approximately 7,457 positions, and no sales clerk positions are available to a person capable of standing and/or walking four of eight hours. (*See Id.*). In response to the ALJ's questioning, the VE testified sorter and assembly jobs were light types of work because of the lifting aspect of up to twenty pounds and, at the light level, existed with sit/stand options. (Tr. 245). Mr. Yep also stated that jobs can be considered light without actually requiring a person to stand for more than a couple hours. (*Id.*). He cited truck driving,

9

operating certain types of machinery, and some seated assembly jobs as jobs considered to be exertionally light rather than sedentary because of the amount of cardiovascular activity a person would engage in while performing his or her job, . (Tr. 245-46).

## III. MEDICAL HISTORY

Plaintiff's earliest medical records date back to June 15, 1995, at which time Dr. Munson examined x-rays of Plaintiff's knees. (Tr. 166-67). Dr. Munson found the right knee joint to be unremarkable except for mild spurring[4] along the margins of the joint, particularly in the medial compartment (central cavity of the knee joint). (Tr. 166). Dr. Munson observed moderately severe degenerative joint disease in the left knee, particularly involving the medial compartment. (Tr. 167).

On April 11, 1996, Dr. Kaplan reviewed new x-rays taken of Plaintiff's knee and compared the left knee x-ray to the previous study performed in 1995. (Tr. 164). Dr. Kaplan noted mild narrowing of the medial compartment associated with subchondral sclerosis[5] and marginal spurring. (Id.). Regarding the right knee, Dr. Kaplan found multiple small calcifications in the area of the flabella that were unchanged in appearance from 1995. (Tr. 165). In both knees, he also noticed some spurring of the supra patella (above the knee cap) and

---

[4]     Bony projections that form along joints and are often seen in conditions such as arthritis. Bone spurs are largely responsible for limitation in join motions and can cause pain. STEDMAN'S MEDICAL DICTIONARY 1659 (26th ed. 1995).

[5]     This finding is represented by increased bone density and is frequently found adjacent to the site of space narrowing. Id. at 1583.

superior patella (knee cap), but otherwise noted no significant change compared to the previous study performed June 15, 1995. (*Id.*).

On November 17, 1998, Plaintiff consulted with Dr. Baliga for x-ray examination of his wrists and shoulders. (Tr. 162). Dr. Baliga observed some deformity of the distal aspect of the proximal phalanx of Plaintiff's left little finger related to previous trauma. (*Id.*). He also noted minimal spurring along the lateral aspects of the ulnar styloid[6] on both sides, but otherwise found no significant wrist abnormalities. (*Id.*). Dr. Baliga additionally observed prominent degenerative type arthritic changes with some subcortical sclerosis and osteophyte[7] formation on the left shoulder and prominent arthritic change with some narrowing and spurring of the right glenohumeral (shoulder) joint. (Tr. 163).

On December 7, 1998, Plaintiff's physician, Dr. Dennis F. Fancsali, performed a Magnetic Resonance Imaging ("MRI") on both of Plaintiff's shoulders. (Tr. 157-60). Dr. Fancsali obtained an anteroposterior ("AP") view of the orbits prior to the MRI and found no radiographic foreign body within the orbits. (Tr. 157). His pre-MRI impression was that Plaintiff had normal orbits. (*Id.*). Upon reviewing the MRI scan of T1 and T2 weighted images, Dr. Fancsali observed a mild to moderate amount of fluid within the left shoulder joint and a slight amount of increased signal in the supraspinatus tendon, suspected to be a function of

---

[6]   A cylindrical projection from the head of the larger forearm bone, to the tip of which is attached the ulnar collateral ligament of the wrist. *Id.* at 1691.

[7]   Bony outgrowth or protuberance. *Id.* at 1270.

tendinopathy,[8] but not a tear. (Tr. 159). Dr. Fancsali also noted evidence of increased signal within the right supraspinatus tendon, indicating fluid in the subacromial subdeltoid bursa.[9] (*Id.*). This was consistent with a tear of the rotator cuff. (*Id.*).

On June 10, 1999, Plaintiff visited Dr. Roelke, concerned with pain in his knees. (Tr. 160). X-Rays were taken of Plaintiff's knees and compared to images taken on April 11, 1996. (*Id.*). Dr. Roelke found arthritic changes, particularly more severe in Plaintiff's left knee. (*Id.*). Dr. Roelke found severe tricompartmental changes of osteoarthritis, most severe in the medial compartment of the left knee. (*Id.*). In the right knee, Dr. Roelke observed more mild tricompartmental changes of osteoarthritis which were similarly prominent in the mediolateral compartments, but he noted that the right knee had not changed significantly since April 11, 1996. (*Id.*).

Dr. E.C. Bone, a physician with Disability Determination Services (DDS), completed a Residual Functional Capacity Assessment (RFC) for Plaintiff on January 28, 2000. (Tr. 149-56). In his assessment, Dr. Bone concluded that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry more than ten pounds, stand or walk with normal breaks for about six hours in an eight hour workday, sit with normal breaks for about six hours in an eight hour workday, and push or pull for unlimited periods with the lift and carry weight limitations.

---

[8]     Either inflammation around the tendon or a series of very small tears in the connective tissue around the tendon. Commonly referred to as tendinitis. *Id.* at 1769.

[9]     Fibrous tissue separating the shoulder blade from the surrounding deltoid muscle. *Id.* at 1692.

(Tr. 150). Furthermore, Dr. Bone noted Plaintiff's postural limitations restricted him from activities frequently or occasionally requiring climbing, frequently balancing or stooping, and occasionally kneeling, crouching or crawling. (Tr. 151). Dr. Bone listed no manipulative, visual, communicative, or environmental limitations. (Tr. 152-53). Dr. Bone concluded that Plaintiff's symptoms were attributable to a medically determinable impairment. (Tr. 154). Furthermore, he found the severity of Plaintiff's symptoms was in line with what should be expected on the basis of his medically determinable impairments. (*Id.*).

Plaintiff visited Dr. Fancsali on May 19, 2000, for the first of a series of Synvisc[10] injections in the left knee. (Tr. 170). Dr. Fancsali noticed no joint effusion, but diagnosed degenerative arthrosis of the left knee joint. (*Id.*). After aspiration of the left knee yielded no fluid, Dr. Fancsali injected Synvisc into the joint and prescribed that Plaintiff return in one week for another injection. (*Id.*).

Plaintiff returned for his second Synvisc injection on May 26, 2000. (Tr. 170). He claimed that he already noticed improvement as a result of the first injection. (*Id.*). Dr. Fancsali again injected Synvisc into the left knee joint and suggested Plaintiff return in one week for a third injection. (*Id.*).

---

[10]     Synvisc is a drug free injection used for therapy and treatment of pain in osteoarthritis of the knee. It is made from salt water and derivatives of hyaluronan, which is a natural substance found in the body and present at very high levels in joints. Hyaluronan acts as a shock absorber and lubricant of joints and is needed for the joint to work properly. RxList, *Synvisc Online, Description, Chemistry, Ingredients* (visited June 15, 2005) <http://www.rxlist.com/cgi/generic3/ synvisc.htm>.

On June 2, 2000, Plaintiff appeared for his third Synvisc injection. (Tr.170). Plaintiff again indicated that his left knee felt some improvement. (*Id.*). Dr. Fancsali again performed a Synvisc injection and advised Plaintiff not to begin Synvisc series treatment for his right knee until he experiences more symptoms. (*Id.*).

Plaintiff returned to Dr. Fancsali on June 29, 2001, again with pain in his legs. (Tr. 170). Plaintiff indicated he had no insurance, and had been unable to find a job, but that he had applied for social security disability. (*Id.*). Plaintiff thought Celebrex helped his pain but previous Synvisc injections gave him no relief. (*Id.*). An exam revealed Plaintiff had planovalgus-moderately severe flat feet, and Dr. Fancsali diagnosed degenerative arthrosis of the knees and bilateral, genu varum (bowed knees). (*Id.*). Dr. Fancsali recommended Dr. Scholl's arch supports, prescribed Celebrex at 200 milligrams per day and issued a Celebrex Patient Need Form. (*Id.*). Plaintiff was asked to return in six months. (*Id.*).

On September 6, 2001 Plaintiff visited Dr. Fancsali because his knees had really been bothering him. (Tr. 169). Dr Fancsali prescribed Tylenol Codeine to be taken every four hours for pain. (*Id.*).

Plaintiff again visited Dr. Fancsali on October 8, 2001 because of continued severe pain in both knees resulting from constant standing required at his new bakery job. (Tr. 169). Plaintiff stated that previously prescribed Celebrex definitely helped, but Dr. Fancsali noted Plaintiff had been taking this medication only on an intermittent basis because of his inability to afford a regular dose. (*Id.*). His diagnosis revealed tenderness with no joint effusion or laxity

14

and indicated degenerative arthrosis of the patellofemoral (knee) joints bilaterally. (*Id.*). Dr. Fancsali refilled Plaintiff's Celebrex prescription. (*Id.*).

On December 19, 2001, Plaintiff visited Dr. Fancsali due to constant knee pain. (Tr. 169). Because Plaintiff could not afford the Celebrex that helped his knee pain, Dr. Fancsali issued prescription coupons to Plaintiff. (*Id.*).

Dr. Fancsali again examined Plaintiff on January 28, 2002. (Tr. 177). The doctor found Plaintiff's knees exhibited a 125° range of motion. (*Id.*). Plaintiff informed Dr. Fancsali that he was applying for Social Security Disability. (*Id.*). Dr. Fancsali agreed to help him fill out paperwork, but claimed uncertainty as to whether Plaintiff would qualify, based on the doctor's physical findings. (*Id.*). Dr. Fancsali recommended an AP and lateral of both knees, and x-rays and MRI's of both shoulders to rule out a rotator cuff tear. (*Id.*). He also recommended that Plaintiff continue with Celebrex at 200 mg per day. (*Id.*).

Plaintiff met with Dr. Kamlesh Ramchandani, a state agency physician, on February 1, 2002. (Tr. 171). He complained of painful knees and ankles for the last ten years. (*Id.*). Dr. Ramchandani concluded Plaintiff was experiencing osteoarthritis in his knees, ankles, and the small joints of both hands and arthralgia (joint pain) of the shoulder joints, resulting from recurrent dislocations. (Tr. 172). Dr. Ramchandani noted Plaintiff's description of the pain as sharp to dull aching, constant, and worsening in bad weather, while performing strenuous activities, or when standing for more than an hour and a half. (*Id.*). Plaintiff also indicated dull aching pain in both shoulder joints for the previous six or seven years associated with recurrent dislocation. (*Id.*). This pain precipitated on any range of motion or on lifting forty to fifty

15

pounds. (*Id.*). Dr. Ramchandani also noted Plaintiff did not use a cane or any assistive device. (*Id.*). Plaintiff was alert, had stable vital signs, a normal, unassisted gait, the ability to walk on his heels and toes and to squat and get up from a squatting position with support. (*Id.*). He also observed that Plaintiff was able to get on and off the examination table with minimal assistance and could dress and undress himself without assistance. (*Id.*). The doctor also recorded Plaintiff's ability to pick up objects, flip pages, and open and close a door. (Tr. 171-72). Upon examining Plaintiff's joints, Dr. Ramchandani found swelling in Plaintiff's knees and in the small joints of both hands. (Tr. 172). The doctor examined Plaintiff's flexibility and range of motion. (Tr. 173-73A). Dr. Ramchandani recorded that Plaintiff exhibited full flexion abduction,[11] internal rotation and external rotation out of his right shoulder, but found he was only able to adduct[12] to 30°, whereas 50° represents the normal full range of motion. (Tr. 173). Plaintiff was equally restricted in adduction from his left shoulder. (*Id.*). He also exhibited only 160° of flexion and abduction (compared to 180° representing full range). (*Id.*). Plaintiff was only able to flex to 100° at his elbows compared to a 150° normal full range of motion. (*Id.*). Plaintiff's knees also exhibited only 130° of flexion and extension compared to 150°, which represents the normal full range of motion value. (*Id.*).

---

[11]      Movement of the limbs toward the lateral plane or away from the body. STEDMAN'S MEDICAL DICTIONARY 2.

[12]      Movement of the limbs toward the medial plane of the body or toward the axial line of the limb. *Id.* at 24.

Dr. Ramchandani ordered a medical imaging report for the Plaintiff which was performed by Dr. Marc Bernstein on February 4, 2002. (Tr. 174-75). Dr. Bernstein reported degenerative changes, most prominent within the medial joint compartment of Plaintiff's left knee. (Tr. 175).

On February 7, 2002, Dr. Fancsali reviewed the MRI results of Plaintiff's shoulders. (Tr. 177). Dr. Fancsali diagnosed Plaintiff with severe glenohumeral joint disease and a small tear of his right rotator cuff. (*Id.*). Plaintiff's left shoulder had severe degenerative joint disease and left rotator cuff tendinitis. (*Id.*). Plaintiff's knees had severe degenerative joint disease, especially of the medial compartment, with degenerative tears of the posterior horn of the medial meniscus[13] and anterior cruciate ligament.[14] (*Id.*).

Dr. Peter J. Karras performed a second RFC for Plaintiff on March 4, 2002. (Tr. 179-86). Dr. Karras agreed with many of the RFC's conclusions from 2000. (*Id.*). He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk with normal breaks for about six hours in an eight hour workday, and sit with normal breaks for about six hours in an eight hour workday. (Tr. 180). He also found no visual or communicative limitations. (Tr. 182-83). From x-rays, Dr. Karras noted degenerative changes with narrowing of the medial joint compartment of Plaintiff's left knee and observed Plaintiff's knee and ankle pain, but indicated Plaintiff had normal and unassisted ambulation. (Tr. 180).

---

[13]     A flat disc-shaped ligament which stabilizes and supports the inner aspect of the knee joint. Commonly injured in knee sprains. *Id.* at 965.

[14]     Ligament that stabilizes the knee joint. *Id.* at 969.

Dr. Karras' assessment differed from Dr. Bone's 2000 RFC assessment, as he found Plaintiff could only push or pull (including operation of hand and/or foot controls) for limited periods due to previous shoulder dislocations, and pain in his knees and ankles. (Tr. 180). Dr. Karras found Plaintiff's postural limitations restricted him from most climbing activities including those involving ladders, ropes, or scaffolds. (Tr. 181). Dr. Karras indicated Plaintiff should only occasionally partake of activities involving balancing, stooping, kneeling, crouching or crawling. (Tr. 181). He found manipulative and environmental limitations which restricted Plaintiff to only occasional reaching in all directions because of his recurrent shoulder dislocations. (Tr. 182). He further indicated that Plaintiff was to avoid even moderate exposure to hazards such as machinery and heights. (Tr. 182-83). Finally, Dr. Karras noted swelling of Plaintiff's knees, stated that his range of motion in his spine was limited to 75° flexion-extension, while his left shoulder was limited to 160° flexion and abduction and both shoulders were limited to 30° adduction. (Tr. 181).

On August 7, 2002, Plaintiff visited Dr. Lance Sathoff at the Monroe Clinic in Wisconsin for evaluation of his knees and shoulders. (Tr. 190). Plaintiff alleged he had bilateral shoulder pain for four to five years. (*Id.*). Dr. Sathoff noted Plaintiff's allegations of knee injuries when he was nineteen years old. (*Id.*). Plaintiff said his pain was the greatest when working, standing, or when he took long walks. (*Id.*). Dr. Sathoff recorded Plaintiff's pain rating as a seven or eight out of ten. (Tr. 193). Dr. Sathoff noted Plaintiff used Celebrex and Tylenol for arthritis pain. (*Id.*). Upon initial examination, the doctor found Plaintiff to be well-developed, well-nourished, alert and oriented with good insight. (Tr. 190-91). Dr. Sathoff examined Plaintiff's shoulders

and found he could forward flex 145°, abduct 145° with pain at the top of motion, internally rotate to chest, and externally rotate to 40°. (Tr. 190). Dr. Sathoff also found Plaintiff had pain in his bilateral lower extremity along the joint line, and in his knee. (Tr. 191). Dr. Sathoff advised Plaintiff to return after he obtained his previous medical records for the doctor's review. (*Id.*). At that time, treatment options would be discussed. (*Id.*).

Plaintiff again visited Dr. Sathoff on September18, 2002, to obtain an evaluation of his right shoulder. (Tr. 188). Dr. Sathoff noted severe arthritis from reviewing Plaintiff's previous x-rays and MRI scans, taken from 1998-2002. (*Id.*). Dr. Sathoff examined Plaintiff's shoulder and found Plaintiff could flex 145° and abduct 145°, although he had pain at the top end of motion. (*Id.*). Dr. Sathoff recorded Plaintiff's pain rating as an eight or nine out of ten on this visit. (Tr. 193). Dr. Sathoff remarked that the only operative intervention that would help Plaintiff long term would be hemiarthroplasty of the shoulder, but that Plaintiff probably had more motion at the time than he would obtain following surgery. (Tr. 188). Dr. Sathoff informed Plaintiff that this option would relieve pain, but not help strength or motion. (*Id.*). Dr. Sathoff and Plaintiff agreed to try physical therapy for Plaintiff's right rotator cuff tear and osteoarthritis in his right shoulder. (*Id.*).

Plaintiff visited Dr. Sathoff on October 16, 2002 for re-evaluation of his bilateral shoulders. (Tr. 187). Upon examination, Dr. Sathoff found Plaintiff could flex from his shoulder, 160°, abduct 160°, internally rotate to chest, and externally rotate 45+°. (*Id.*). At this time, Dr. Sathoff recorded Plaintiff's pain rating as a five or six out of ten. (Tr. 193).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citations omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *also see Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimum articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness

credibility determination is based upon the ALJ's subjective observation of a witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[15] The Commissioner

---

[15]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Pts. 404, 416. For syntactic simplicity, future references to Pt. 416 of the regulations will be omitted where they are identical

sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[16] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination.

---

to Pt. 404.

[16]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite her or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

23

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One analysis, the ALJ found that Plaintiff had engaged in work since his alleged onset date, but found the evidence was insufficient to show if the work was substantial gainful activity, so he found that Plaintiff satisfied Step One. (Tr. 14-15). The finding of the ALJ as to Step One of the analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination that Plaintiff satisfies Step One of the analysis is affirmed.

## B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two analysis, the ALJ found Plaintiff suffered from severe impairments, specifically degenerative conditions of both shoulders and both knees. (Tr. 15-16).

This finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the analysis is affirmed.

## C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

The ALJ next considered whether Plaintiff's impairment met or equaled an impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (Tr. 15). The ALJ determined that Plaintiff's impairments did not meet or equal any listed impairment. More specifically, the ALJ found that Plaintiff had degenerative conditions of his shoulders and knees, but not to the point that causes the requisite functional loss as described in Listing 1.02. (*Id.*). Neither party contests this third finding. The ALJ's determination as to Step Three of the analysis is affirmed.

## D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff was not able to perform his past relevant work because even his least demanding past relevant job required him to perform work activities inconsistent with his residual functional capacity ("RFC"). (Tr. 18). Before doing so, the ALJ determined Plaintiff's RFC. (Tr. 16-18). The RFC is what a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945 and Social Security Ruling 96-

9p ("SSR 96-9p"). After considering the entire record, the ALJ found Plaintiff had the residual functional capacity for a limited range of unskilled light work.[17] (Tr. 19). More specifically, the ALJ concluded that Plaintiff's medically determinable impairments precluded the following work-related activities:

> lifting more than 20 pounds occasionally or more than ten pounds frequently; standing and/or walking for more than an hour at a time and for more than a total of six hours in an eight hour workday; sitting for more than an hour at a time and for more than a total of six hours in an eight hour workday; more than occasional pushing and pulling and operation of foot controls; more than occasional climbing stairs, balancing, stooping, or crouching; and any reaching overhead, climbing ladders, kneeling, crawling, or working around hazards.

(*Id.*).

The ALJ reported that the objective findings in Plaintiff's medical history failed to provide support for his allegations of disabling symptoms and limitations greater than those included in this RFC. (Tr. 16).

The Plaintiff does not challenge the ALJ's conclusion at Step Four of the analysis, that Plaintiff is unable to perform past relevant work. However, Plaintiff does challenge the ALJ's RFC determination, asserting that the ALJ wrongfully discredited Plaintiff's allegations regarding his pain by not following SSR 96-7p. (Pl.'s Mem., at 4-7). At issue is whether the

---

[17]    Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

ALJ fully analyzed Plaintiff's credibility and impairments. Defendant asserts that the ALJ's RFC is substantiated by Plaintiff's medical record and should be upheld.

The court's own review of Plaintiff's medical record indicates that his doctors offered consistent findings, diagnosing Plaintiff with a torn right rotator cuff, left shoulder tendinitis, and arthritis in both shoulders as well as degenerative osteoarthritis in Plaintiff's knees, more severe in the left than the right. (Tr. 160-67). However, these conditions did not produce disabling symptoms.

After examining Plaintiff's range of motion on January 28, 2002, physician, Dr. Fancsali found Plaintiff's knees exhibited a 125° range of motion compared to 150° which is the normal full range of motion. (Tr. 177). Dr. Fancsali reviewed MRI results of Plaintiff's knees and shoulders. (*Id.*). He diagnosed Plaintiff with severe glenohumeral joint disease in Plaintiff's right shoulder and a right rotator cuff tear, left rotator cuff tendinitis with severe degenerative joint disease, and severe degenerative joint disease of both knees including degenerative tears of the posterior horns of the medial meniscus and anterior cruciate ligaments in both knees. (*Id.*). Plaintiff informed Dr. Fancsali that he was applying for Social Security Disability. (*Id.*). In Dr. Fancsali's notes from January 28, 2002, he wrote "I have advised [Plaintiff] that we would be happy to fill out the papers but I am not sure he qualifies based on his physical findings." (*Id.*). The record includes doctor's notes from at least four subsequent visits with Dr. Fancsali, after he had reviewed further evidence of Plaintiff's medical problems. (Tr. 177-78). Dr. Fancsali offers no opinions to contradict his statement from January 28. (*Id.*).

On February 1, 2002, Plaintiff met with a state agency physician, Dr. Ramchandani, who more fully examined Plaintiff's range of motion. (Tr. 171). At this examination, Plaintiff complained of painful knees and ankles that worsened while performing strenuous activities or when standing for more than an hour and a half. (*Id.*). Plaintiff also indicated pain in both shoulder joints for the previous six or seven years precipitated on any range of motion or on lifting forty to fifty pounds. (*Id.*). Dr. Ramchandani recorded that Plaintiff exhibited full flexion abduction, internal rotation and external rotation out of his right shoulder, but found he was only able to adduct to 30°, whereas 50° represents the normal full range of motion. (Tr. 173). Plaintiff was equally restricted in adduction from his left shoulder. (*Id.*). He also exhibited only 160° of flexion and abduction (compared to 180° representing full range). (*Id.*). Plaintiff was only able to flex to 100° at his elbows compared to a 150° normal full range of motion. (*Id.*). Plaintiff's knees also exhibited only 130° of flexion and extension compared to 150°, which represents the normal full range of motion value. (*Id.*). Dr. Ramchandani also noted Plaintiff did not use a cane or any assistive device. (*Id.*). Plaintiff was alert, had a normal, unassisted gait, and the ability to walk on his heels and toes. (*Id.*). He also observed that Plaintiff was able to get on and off the examination table with minimal assistance and could dress and undress himself without assistance. (*Id.*). The doctor also recorded Plaintiff's ability to pick up objects, flip pages, and open and close a door. (Tr. 171-72).

Plaintiff's diagnosis of a torn right rotator cuff, left shoulder tendinitis, and arthritis in both shoulders is consistent with the ALJ's RFC finding that Plaintiff should perform no overhead reaching or lifting of objects weighing more than twenty pounds occasionally or ten

28

pounds frequently. (Tr. 160-67). Furthermore, this evidence supports that Plaintiff is not able to

perform work requiring heavy[18] or even medium[19] exertional demands. However, this evidence

does not indicate that Plaintiff is restricted from all light work. In fact, Plaintiff offers evidence

that a dull ache in his shoulders would occur with lifting forty to fifty pounds, yet light work only

requires the ability to lift twenty pounds on occasion and ten pounds frequently. Further

evidence from the ALJ's RFC shows that Plaintiff can perform light activities such as

occasionally pushing, pulling and operating foot controls and sitting, standing, and walking with

occasional breaks for six hours in an eight hour workday.

Furthermore, Plaintiff's osteoarthritis treatment records do not indicate disabling

symptoms. (Tr. 160-67). X-rays compared from June, 1995, through 1999, indicate a gradual

progression of arthritis and a narrowing of the medial compartment, particularly in Plaintiff's left

knee. (Tr. 160, 166-67). However, Plaintiff indicates that his knees become painful after

standing for half an hour, walking a mile, or lifting sixty pounds. (Tr. 171). This is not a

concern as a limited range of light work does not require Plaintiff to do such activities, and may

in fact involve sitting most of the time. *See* 20 C.F.R. § 404.1567(b).

We note that Plaintiff does not have the ability to substantially perform all exertionally

light activities, however sufficient evidence supports the ALJ's finding that Plaintiff can perform

---

[18]     Heavy work involves lifting no more than 100 pounds at a time with frequent
        lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy
        work, we determine that he or she can also do medium, light, and sedentary work.
        20 C.F.R. § 404.1567(d).

[19]     Medium work involves lifting no more than 50 pounds at a time with frequent
        lifting or carrying of objects up to 25 pounds. 20 C.F.R. § 404.1567(c).

a limited amount of light work, particularly because Plaintiff tends to experience most of his pain when partaking in activities that require exertional demands *exceeding his RFC*. Plaintiff became employed in several positions since 2000, and each of these positions required physical demands on his body that were outside the breadth of his capacity as determined by his RFC. Furthermore, the increased frequency of Plaintiff's doctor visits since 2000 coincide with Plaintiff's constant efforts to maintain a job requiring exertional demands beyond his RFC, as noted by the ALJ.

The ALJ properly discredited Plaintiff's complaints of pain as being out of proportion with that supported by the medical record. Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Banhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, in evaluating credibility, the ALJ must follow his own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination. Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

An individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent

with the objective medical evidence and other evidence in the case record. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4); SSR 96-7P. When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. SSR 96-7P. In recognition that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence alone, 20 C.F.R. 404.1529(c)(4) and 416.929(c) describe the kinds of evidence the adjudicator must consider. (Id.). This evidence includes the following factors:

> (1) [i]ndividual's daily activities; (2) location, duration, frequency, and intensity of the individual's pain and other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

(Id.).

In this case, the ALJ did not randomly discredit Plaintiff's complaints of disabling symptoms. To the contrary, the ALJ addressed SSR 96-7p factors relevant to his decision and any omissions were insignificant.

The court's own review of the record as a whole revealed no errors of law, and the court agrees that the ALJ's ruling is supported by substantial evidence. The ALJ considered Plaintiff's daily activities. Plaintiff retained the ability to do small chores like driving his children to and from school, grocery shopping, performing housework, yard-work, and preparing meals. (Tr. 89-

91, 129). The ALJ also considered factors that precipitated and aggravated Plaintiff's symptoms including lifting forty or fifty pounds, standing for an hour, walking a mile or lifting sixty pounds. (Tr. 17). The ALJ noted Plaintiff's most effective medication was Celebrex with "apparently no consistently significant side effects." (Tr. 16, 17). The physical therapy Plaintiff performed to increase his shoulder range of motion was noted by the ALJ for its significance as treatement other than medication that Plaintiff recieved. (Tr. 16-18). Lastly, the ALJ considered as other factors concerning Plaintiff's functional limitations, that Plaintiff's gait was unassisted and he could dress and undress himself. (Tr. 16, 17).

Most importantly, the medical and administrative record support the ALJ's findings of Plaintiff's residual functional capacity. The only medical residual functional capacity assessments of record were conducted by two physicians from Disability Determination Services ("DDS"); one in 2000, and the other in 2002. (Tr. 149-56, 179-86). In the first RFC, Dr. E.C. Bone concluded that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry more than ten pounds, stand or walk with normal breaks for about six hours in an eight hour workday, sit with normal breaks for about six hours in an eight hour workday, and push or pull for unlimited periods with the lift and carry weight limitations. (Tr. 150). Dr. Bone noted Plaintiff's postural limitations restricted him from activities frequently or occasionally requiring climbing, frequently balancing or stooping, and occasionally kneeling, crouching or crawling. (Tr. 151). Dr. Bone listed no manipulative, visual, communicative, or environmental limitations. (Tr. 152-53).

32

Dr. Peter J. Karras reported similar findings in the 2002. (Tr. 179-86). He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk with normal breaks for about six hours in an eight hour workday, and sit with normal breaks for about six hours in an eight hour workday. (Tr. 180). He also found no visual or communicative limitations. (Tr. 182-83). From x-rays, Dr. Karras noted the same degenerative changes with narrowing of the medial joint compartment of Plaintiff's left knee and observed Plaintiff's knee and ankle pain that had been diagnosed by previous treating physicians. (Tr. 180). However, Dr. Karras still indicated Plaintiff had normal and unassisted ambulation.[20] (*Id.*). Dr. Karras' RFC assessment yielded some additional restrictions not found two years earlier. (Tr. 180). He found Plaintiff could only push or pull (including operation of hand and/or foot controls) for limited periods and Plaintiff's postural limitations restricted him from most climbing activities including those involving ladders, ropes, or scaffolds. (Tr. 181). Dr. Karras indicated Plaintiff should only occasionally partake of activities involving balancing, stooping, kneeling, crouching or crawling. (Tr. 181). He found manipulative and environmental limitations which restricted Plaintiff to only occasional reaching in all directions because of his recurrent shoulder dislocations. (Tr. 182). He further and indicated that Plaintiff was to avoid even moderate exposure to hazards such as machinery and heights. (Tr. 182-83). Finally, Dr. Karras stated that Plaintiff's spinal range of motion was limited to 75° flexion-extension, while his left shoulder was limited to 160° flexion and abduction and both shoulders were limited to

---

[20]      Walking about or able to walk about. STEDMAN'S MEDICAL DICTIONARY 57.

30° adduction. (Tr. 181). Thus, both RFC's indicated Plaintiff could sit or stand and walk for six hours in an eight hour workday, with normal breaks. (Tr. 150, 80).

Given the longitudinal record, this court finds that substantial evidence in the medical and administrative record exists to support the ALJ's RFC and Step Four findings. **The court specifically finds that evidence supports the ALJ's findings regarding manipulative limitations of overhead reaching and of sitting, standing, and or walking for no more than one hour at a time and no more than six hours in an eight hour workday.** Therefore, the ALJ's determination as to Step Four of the analysis is affirmed.

### E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

The ALJ determined at Step Five that Plaintiff could perform a limited range of light, unskilled work. (Tr. 18-20). The ALJ opined that there remained a significant number of jobs in the economy that Plaintiff could perform, such as the jobs identified by the VE: assembly (27,507 jobs), sorting (9,782 jobs), and sales clerk (129,010 jobs). (Tr. 19).

Though the ALJ relied on the testimony of the VE to determine whether work existed for Plaintiff at Step Five, the ALJ also referred to the Medical-Vocational Guidelines. The ALJ noted that from January 1, 2002, through April 10, 2002, claimant was in the "younger individual" category because Plaintiff was not yet fifty years old. (Tr. 18). For this time frame, the ALJ found that the Medical-Vocational rules directed a finding of "not disabled. (*Id.*). Plaintiff, born April 11, 1952, turned fifty April 11, 2002, and at this time became categorized as

34

"closely approaching advanced age." (Tr. 18, 20). Even so, for the period of April 11, 2002, to the date of the ALJ's decision, the ALJ found Plaintiff was "not disabled." (Tr. 20).

The findings of the ALJ at Step Five are challenged by Plaintiff. Plaintiff argues that due to his limitations, he can only sit with normal breaks four hours in an eight hour workday or stand and/or walk four hours in an eight hour day. Due to this restriction, he also argues for consideration of an appropriate discount to the above listed numbers of available jobs. He then argues that following this additional discount, the number of jobs at the light level would fall below what would be considered a significant number of jobs in the economy. This argument fails. As the court found at Step Four, substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity. Evidence in the record shows: (1) Plaintiff's shoulders ached when lifting forty to fifty pounds, however light work only requires a maximum lifting of twenty pounds; (2) Plaintiff's knees became painful after standing for half an hour, walking a mile or lifting sixty pounds, however some light jobs do not require more than a couple hours standing, and walking a mile and lifting sixty pounds exceed the exertional levels considered light work; (3) Plaintiff had the ability to occasionally push, pull and operate foot controls; (4) Plaintiff did not use a cane and his gait was normal and unassisted; (5) Plaintiff's own physician noted skepticism as to whether Plaintiff qualified for disability benefits based on the doctors physical findings; and (6) Plaintiff routinely performed daily chores at a light exertional level including: cooking, shopping for groceries, performing yard work and household chores, and taking care of his children. Thus, Plaintiff's main objections at Step Five were already addressed by the court at Step Four, and will not be addressed again.

Plaintiff also appears to argue that the vocational expert did not appropriately consider all evidence provided in the record when responding to the ALJ's hypothetical and, therefore, overestimated his ability to perform limited light work.

This court finds that the ALJ properly consulted a vocational expert to learn what jobs Plaintiff could perform and also to discover the significance of the effects of Plaintiff's combined limitations on the occupational base. (*See* SSR 83-12). At the hearing, the ALJ inquired of the VE, "[h]ave you had a chance to review the record?" (Tr. 230). The VE responded "[y]es sir. I have." (*Id.*). Nothing in the ALJ's hypothetical or subsequent questioning restricted the VE from using knowledge about the Plaintiff gained by review of the record. Additionally, the ALJ's hypothetical properly included each of the limitations that were shown to be supported by sufficient evidence at Step Four. Plaintiff's contention that the VE did not review sufficient evidence regarding Plaintiff and his limitations is unfounded. If Plaintiff's counsel believed the VE was uninformed, he could have questioned the expert during the hearing, yet the VE was not questioned at the hearing about Plaintiff's lifestyle, daily activities, or Plaintiff's medical impairments. Beyond this, the court finds that the VE's testimony and responses to questions posed by the ALJ and Plaintiff's counsel reveals his extensive knowledge of Plaintiff's past work history. (Tr. 236-40).

The only other question the court will review at Step Five is whether the ALJ's RFC determination implied Plaintiff was limited to jobs offering a sit/stand option, and whether the VE properly considered only jobs offering a sit/stand option when computing the number of available jobs for the ALJ's hypothetical. If Plaintiff is only capable of performing jobs that have

sit/stand options, the ALJ should then consider whether job numbers are satisfactory under the Regulations. SSR 83-12. This issue was not clearly raised by Plaintiff, but the court discusses it in order to clarify otherwise confusing testimony in the record.

The ALJ stated that Plaintiff could sit, stand, and walk for up to six hours in an eight hour workday, but tempered this conclusion by adding to his RFC and to his hypothetical that Plaintiff could sit, stand, and walk "up to one hour at a time without interruption." (Tr. 237). However, the ALJ never directly stated that Plaintiff must be accommodated with a sit/stand option, and the VE never clearly explained if or how he reduced job numbers due to this limitation.

Nonetheless, the court finds that the record offers enough evidence to indicate the VE understood the sit/stand limitation and accounted for it in his deductions of the available job numbers. The ALJ specifically clarified his hypothetical to the VE, stating, "My hypothetical meant he could stand six hours a day, walk six hours a day, and sit six hours a day. He can do those for up to one hour at a time without interruption." (Tr. 239). As well, the VE testified "assembly and sorting positions would allow for the person to sit or stand in some situations, and to alternate positions." (Tr. 240-41, 245). Finally, the VE included in his testimony that an at will sit/stand requirement is available in some jobs, but not others, depending on the nature of job duties. (Tr. 240). Therefore, the ALJ properly consulted a VE and correctly found that Plaintiff could perform work that exists in substantial numbers. Thus, the court finds sufficient evidence indicating the VE considered implications of a sit/stand requirement when he discounted the available job numbers.

Accordingly, the court finds that substantial evidence supports the ALJ's Step Five decision, and therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the record and pleadings is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/27/08